## Custody of Prisoners Under Death Sentence

WOODWARD, Deputy Attorney General, March 7, 1940. —We have your request for a formal ruling as to the place in which a convict, who has been found guilty of

murder in the first degree and sentenced to death by electrocution, shall be kept in custody after the sentence has been imposed, and until penalty of death has been inflicted.

You state that in years past in some cases the prisoner has been held in the county jail until such time as the sheriff has been directed to read the formal death warrant to the prisoner, after which he has been removed to the Rockview branch of the Western State Penitentiary. You further inquire whether this practice is a "requirement" or merely a "custom".

You also state that as a safety measure it would appear advisable in some cases to remove the prisoner to the penitentiary until such time as a definite date of execution has been named.

Such a situation is governed by the Act of June 19, 1913, P. L. 528, 19 PS §1122 et seq., which provides in part as follows:

"Section 2. Whenever any person shall have been convicted and sentenced to death, the clerk of the court where such conviction shall have taken place shall transmit to the Governor or the Commonwealth a full and complete transcript of the record of such trial and conviction, within thirty days after sentence, or, in the event of an appeal, within twenty days after the final disposal of the cause upon such appeal.

"Section 3. After the receipt of the said record the Governor of the Commonwealth shall issue his warrant, directed to the warden of the Western Penitentiary, commanding said warden to cause such convict to be executed in said penitentiary, within the week to be named in said warrant, and in the manner prescribed by law.

"Section 4. Upon the receipt of such warrant the said warden shall, by a written notice under his hand and seal, duly notify the officer having the custody of such convict to deliver such convict to the custody of such warden, and it shall be the duty of such officer to forthwith cause such delivery to be made. Thereupon, and until the penalty of

death shall be inflicted, or until lawfully discharged from such custody, said convict shall be kept in solitary confinement in said penitentiary. During such confinement no person except the officers of such penitentiary, the counsel of such convict, and a spiritual adviser selected by such convict, or the members of the immediate family of such convict, shall be allowed access to such convict without an order of said court or a judge thereof."

The language of this act contained in the sections above quoted bearing upon the point raised in your communication is so plain as to render the answer to your question altogether free from doubt.

It appears that this act was construed in former opinions of this department. In Boyd's Case, dated March 4, 1915, Opinions of the Attorney General, 1915-1916, page 511, 45 Pa. C. C. 14, it was stated, in part (p. 15):

". . . that the prisoner referred to is not in the custody of the sheriff of Philadelphia county, but is in the custody of the keeper of the Philadelphia County Prison, whose duty it is to deliver him to you, as the warden of the Western Penitentiary, upon receipt of the notice referred to in §4 of the act of 1913."

This act was also interpreted in Prisoners Under Sentence of Death, dated August 2, 1922, Opinions of the Attorney General, 1921-1922, page 444, 2 D. & C. 354, in which it was stated, in part (p. 355):

". . . convicts delivered to the custody of the Warden of the Western Penitentiary under the provisions of the aforesaid act cannot lawfully be returned to the custody from which they were received by the warden upon a respite granted by the Governor, the custody imposed by the act upon the warden and the manner and place of confinement not being affected thereby."

The death house at Rockview has not been used for long custody nor for the custody of a large number of prisoners, as there is a maximum cell capacity for only six convicts, and no accommodations whatever for women. It not infrequently happens that there are more than this

number of convicts throughout the Commonwealth upon whom the death sentence has been imposed. In order to take custody of all such convicts, it would be neccessary to enlarge the quarters at Rockview, and to maintain a continuous death watch, which would involve a special appropriation therefor.

It is doubtful whether it was ever intended that a convict should be confined to the death chamber for any other purpose than to be put to death. Frequently, a convict who goes to the death chamber at Rockview is without funds; usually his family is also without funds. During the time that he is in custody there he would virtually, by reason of the costs of transportation, etc., be deprived of seeing his family, his counsel, and his spiritual adviser, who are the only persons allowed access to the convict, according to the term of the act. This would result in a hardship to the convict, due to the fact that it often happens that after the death sentence has been imposed, there is a considerable lapse of time due to causes such as appeals and respites.

Were a large number of convicts confined in the death house for long periods, it would constitute most inhumane treatment constantly to subject them to the ordeals of witnessing the preparations for, and the actual going of fellow-convicts to, their deaths a few feet away.

It will be observed from the language of section 4 of the act that upon the receipt of the death warrant, the warden shall *duly* notify the officer having custody of the convict to deliver him to the warden, etc.

There is nothing in the act which requires a convict to be delivered to the penitentiary immediately. Nor is it advisable to do so, especially in view of the conclusions reached in the opinion cited in Prisoners Under Sentence of Death, Opinion of the Attorney General, 1921-1922, page 444, that convicts delivered to the warden under the act cannot lawfully be returned to the custody from which received by the warden on a respite granted by the Governor.

The word *duly* is defined in The Century Dictionary and Cyclopedia as follows:

"In a due manner; when or as due; agreeably to obligation or propriety; exactly; fitly; properly."

" 'Duly' in legal parlance means according to law; in accordance with what is right, required, or suitable, fittingly, becomingly, regularly. Chattanooga Boiler & Tank Co. v. City of Collinsville, Tex. Civ. App., 111 S. W. 2d. 1170, 1171": 2 Words and Phrases, Fifth Series, page 536.

"The word 'duly' means in due or proper time, in accordance with what is right, required, or suitable, and meaning 'according to law.' Dixie Grain Co. v. Quinn, 61 So. 886, 889, 181 Ala. 208": 3 Words and Phrases, Third Series, page 79.

In view of the foregoing, it appears that the present practice of receiving convicts at the penitentiary after all reasonable likelihood of further respite or commutation has passed, and immediately prior to the time set for the infliction of the death penalty, is a reasonable and proper interpretation of the act.

This interpretation would not prevent the removal of a convict to the penitentiary by agreement between the proper authorities, under special circumstances as a safety measure, or where in a particular county facilities are not adequate to take care of such convict.

We are of the opinion, therefore, and you are accordingly advised that, after the receipt of the death warrant, the warden of the Western State Penitentiary should duly, or in proper time, notify the officer having custody of a convict who has been sentenced to death by electrocution, to deliver such convict to the warden; and until the penalty of death shall be inflicted or until lawfully discharged from such custody, said convict should be kept in solitary confinement in said penitentiary, in accordance with the provisions of the act.